I guess we'll hear from Mr. Schnitzer first. Good morning, Your Honors, and may it please the Court. My name is David Schnitzer of Gibson, Dunn, and Crutcher, appearing for Plaintiff Appellant's Save Our Sound Outer Banks. This is a case about agencies improperly predetermining the outcome of their decision-making before completing the environmental analysis required by the National Environmental Policy Act, or NEPA. In 2013, after years of study, the defendant agencies picked a preferred alternative for addressing problems with Highway NC-12 in the Rodanthe area of the North Carolina Outer Banks. But then they put that decision on hold while they negotiated a settlement of a court challenge to a related but separate NC-12 final agency action. An agreement was reached under which the agencies would reverse course and pick the Jug Handle Bridge alternative for the Rodanthe area. Wasn't there some reversal of course already because of concerns articulated by members of the NEPA consortium? There were, in fact, some concerns along the way, some of which had been raised even before the 2013 selection of the preferred alternative and were not apparently prevailing at that stage. What seems particularly concerning under this court's predetermination precedence is that by their own admission, the agencies put their final decision-making, quote, on hold. It says that, in fact, in one of the status reports for the merger meeting in addition to some e-mail correspondence. And then shortly thereafter, shortly after the settlement was reached, after this court's remand, they immediately moved forward again and within a few weeks picked the alternative outcome. What is the environmental concern right now? I mean, is there a fish that's being hurt or is there— This case rings ultimately as a procedural interference, it seems to me. There was an EIS done in 2008 that addressed a bridge very close to where this one goes. And this one is a little farther out in the water, but it leaves the land and reenters the land about the same place, very close, immaterial. Nobody's identified any distinction on that of significance. And the environmental concern, it sounds to me like this is just an effort to oppose the bridge and use a procedural claim to interfere with the bridge. Is there a real substantive issue here on the environment? Certainly, Your Honor. NEPA recognizes a broad range under the umbrella of environmental concerns, and the bridge through the sound, in fact, it implicates recreational and aesthetic uses primarily. Of course, but the 2008 addressed that identical issue. Go ahead. And part of the concerns that were articulated with respect to the easement bridge were that it would be located within the surf zone with adverse impacts on recreation, wildlife, and it would not meet erosion setbacks where the jug handle option would. And the jug handle alternative removes almost two miles of NC-12, as I understand it, from the wildlife refuge and would restore almost 20 acres of habitat. Aren't those all legitimate concerns? Those are also environmental concerns under, as NEPA defines them, certainly. And those are What is the concern? The concern is that NEPA is a procedural step Not procedural. I want to hear what the substantive concern is. In other words, is a snail darter involved? Is there an eagle involved? What is the issue that is being raised as opposed to just basically opposing the bridge? I mean, this group apparently just opposes the bridge. Your Honor, in fact, that is correct. I would not represent otherwise. But NEPA recognizes a broad basket of environmental rights, and the recreational and the aesthetic impacts are certainly within that. But they did do an EIS. They did. In 2008. And they found that there was no substantial Didn't they do an assessment after that? Actually, if I could go back to one of your earlier comments about differences in the alignment of the bridge. And a significant difference, actually, between the 2008 version and the version ultimately approved is the terminus on the southern end. It previously came in. I believe it's only about a quarter or a third of a mile, which does not sound like a lot, but it came in in the historic area of Rodanthe, not immediately adjacent to a number of the of the property owners in the Pappy Lane area. And they adjusted that alignment. And it now runs. The alignment is now directly adjacent to to their to their homes. So that and that was not the case in the 2008. There were there was, in fact, the 2013 study that identified the bridge in easement was it was a was an additional study. And then there was the additional study that post dated the settlement agreement that then led to the record of decision. Underlying. Yeah. Correct. And there was a 2010 one. So there's been three environmental assessments since the 2008 environmental impact study, as I understand it. And in the in the 2013 one, I think they've all tracked the differences, however minor or significant they might be characterized factually and evaluated the impact of those. And the 2013 one, I think, did that. Or the 2016 one mentions that and says they're nearly identical. I think it says that that the 2014 D alignment, which is the one that was ultimately selected, was almost identical to the 2013 alignment. That's the comparison that that made. The 2013 alignment, however, is not the same as the 2010 alignment or the 2008 alignment. It moved numerous times in numerous directions, particularly in compared to the 2013 version. The 2014 version is considerably closer to shore, which has a direct impact. In fact, its outer distance of about 1400 feet from shore is actually the was the inner distance was the closest in distance of the 2013 version. And what is what is the implication? And what do you identify as the implication of that? That the agencies appear to have made a switch without fully without fully analyzing the alignment that they actually ultimately picked. But can you again, can you say how that change adversely impacted the environment from the 2013? Because that's I mean, the difficulty that I'm having with your argument, I suppose, is reflected to some extent in Judge Niemeyer's questions. A predetermination argument or analysis does focus on the environmental analysis. So I'm trying to understand what your substantive environmental concerns are. Well, Judge Duncan, as this court noted repeatedly in the Defenders of Wildlife decision, the predecessor case, NEPA is, it is a procedural statute and it requires the agencies to go through a certain process before they come to their conclusion. And the point of predetermination cases is that there is not supposed to be undue direct and substantial influence on that independent decision making process. I'm quite painfully familiar with that. But there does appear to be, have been an informed decision making process here. And I do take your concern that having three of the agencies put forward the jug handle bridge as a preferred alternative does seem to be putting a finger on the scale. But ultimately, do we not consider that in the context of what the respective environmental impacts are going to be? And they appear to be counterbalancing because greater environmental impacts were identified with respect to the easement bridge by members of this group. Before, I'm not sure whether it was before the settlement, but at some point I can look back in my notes and find out. I believe you'd be referring to the intervener, by the interveners here, not by the plaintiff appellants with the easement bridge. I get you. Yeah, I'm still getting adjusted to the reverse posturing. It's a realignment of interest. It certainly is. It's entirely possible. Can I ask one thing about, you've talked about the switch, if you will, from the 13 preferred alternative to the 2014B alternative. Going back to the section 4F analysis in 2013, it certainly identified the within easement bridge as the, I'm learning to live by an acronym, the LEDPA. But in doing so, as I read it, it looked like it said the within easement alternative had certain advantages and disadvantages, and the bridge that was into the sound had certain advantages and disadvantages. In other words, it ultimately identified the within easement as the least environmental impact, but it did so with language that was fairly, hey, these both have pros and cons. Certainly, Your Honor, and it did identify some of the pros and cons. However, neither the 2013 version nor the later version, which ultimately switched to the jug handle bridge, fully engaged with some of the problems that are posed by the jug handle alternative. Those were, to some degree, less relevant when that wasn't the alternative that they were advancing. For example, the beach nourishment issue had significantly changed since the original 2008 EIS, and that was never fully and properly analyzed in any of the various studies along the way, and that is a significant consideration in whether or not the easement bridge was actually a significant or a viable option. I realize you may believe it wasn't fully evaluated, but it was identified that the erosion rate had decreased. It was identified as still to have a significant erosion rate, and the reasons for originally eliminating the nourishment alternatives were based upon what they said, other issues besides the erosion rate. In particular, the inability to respond to a breach from the storm. So I understand you would like more analysis on that, but it seems like the decision to eliminate those was based on other factors besides the nourishment issue. Well, I believe there are multiple intertwined. The changes in circumstances related to the beach nourishment are all intertwined. First, the prediction of the erosion rates, that went down, and then the availability of sand was a totally newfound factor that was not believed to previously be available at all. The less erosion, the less sand you need. The less sand you need, the less expensive it is. All of the factors were intertwined. There's folks who say nourishment has adverse environmental impacts. So whichever one you pick, someone's going to say, hey, there's downsides of all of this. And so kind of back to earlier question, aren't you just going to oppose anything that improves this bridge and find a reason for it after the fact? Certainly not. Plaintiffs believe that the appropriate approach was the easement bridge on the existing right-of-way. Their primary objection is that the jug-handled bridge was previously found to be the less desirable alternative, and then through what appears to be a violation of the NEPA process, the entire point of NEPA being an environmentally-driven decision, that that decision was switched. And that is the fundamental point of the entire statute. At what point did the concerns articulated by the North Carolina Division of Water Resources, Division of Coastal Management, and the Department of Interior with respect to the easement bridge surface, when were they articulated? I believe some during roughly the same period where the settlement discussions were going on, but I don't want to be more specific and misstate the record, Your Honor. After there was also opportunity for public notice and comment during the ROD process, was there not? During the most recent ROD process, yes. There were after the environmental assessment prior to the ROD. All right. I think you're right. Did the recent hurricane change anything down there? It actually did not appear to have a significant impact, including actually it did not appear to wash out any of the spots on the road. From what the press was saying, I thought it would have knocked out the whole lot of banks. That was our expectation going into it, and we were pleasantly surprised that everybody came through it pretty well. The southern beaches. It did. If there were no more questions, I could reserve them now. You have some rebuttal. Yes. All right. Ms. Hanson-Young. Good morning, Your Honors. May it please the Court, my name is Tekla Hanson-Young, and I represent the Federal Highway Administration. With me is Mr. Justice, who represents the North Carolina Department of Transportation, and he will be speaking for six minutes, and Ms. Hunter, who represents the Environmental Group Intervenors. I'd like to start out by answering. She's not speaking, though, is she? She's not speaking. She will be available to answer any questions, should the panel have any for her client specifically. I'd like to first start out by answering the question posed to my friend about the timing of when the new location, the Jug Handle Bridge alternative, was developed and the genesis of that alternative. If the Court looks to Joint Appendix Pages 745 through 47, there's a thorough discussion of the specific timeline of when each federal and state agency raised certain concerns with the 2010 easement alternative, and specifically the North Carolina Department, I'm sorry, specifically the National Marine Fisheries Service identified some concerns in 2013. The Department of Interior also identified concerns in 2013. The North Carolina Department of Environmental Quality Division of Water Resources also identified concerns in 2013, and so did the Division of Coastal Management. And that was all prior to this Court's partially adverse ruling, which was in June 2014, which initiated the settlement conversations that ultimately led to the settlement agreement being signed in 2015. Not only had multiple federal and state agencies expressed concern in 2013 and 2014 before the parties had even started contemplating settlement, the agencies had decided to go back and look at both alternatives again in detail to really decide and investigate which alternative was better. And that's also discussed in those pages in the Joint Appendix and elsewhere in the record, specifically at Joint Appendix 948 and 1040. The point is that the record shows that the Jug Handle Bridge alternative was developed long before the settlement agreement was ever contemplated. But I would posit that this Court need not even look at those issues because on the face of the environmental analysis, the agencies complied with NEPA, and the plaintiffs have not identified any specific flaw in the analysis. I think their point is, and I'm not sure it's fully supported by the language of their settlement agreement, but their point is that the sequence of decision-making and the NEPA assessment is out of line, that the agreement had been made before they had the assessment. I think that's their main point, isn't it? I think so. But what this Court has found in the National Audubon Society case is that to assess claims of predetermination, the Court should look to the sufficiency of the environmental analysis itself. And here, there are no problems with the environmental analysis, so this Court could dispose of the predetermination claim on that basis alone. That's sort of a no-harm issue. Right. I understand, and that was the basis of a question of mine. But stepping back, you have the rather odd circumstance of the settlement at least appearing to stamp its imprimatur on what appears to be a change in position. And the timing gives rise to the question. So I take your point. But as a practical matter, it seems as though as the appellants here articulated it, that the decision might have been reached as a result of the settlement and not driven by the environmental analysis itself. You're saying that it wasn't, but they're saying that the timing suggests otherwise. And respectfully, I would flip that around and say the timing suggests that the alternative that was ultimately selected was driven entirely by the environmental analysis. And that's demonstrated by comments and concerns that were identified by other federal and state agencies in 2013. And also, the agency, Federal Highway Administration, explained at JA 1740, I believe 1748 or 1747, specifically why it changed course from the 2010, or my apologies, the 2013 proposal of the easement bridge, precisely because the other agencies had identified concerns with it. And the jug handle bridge alternative was the least environmentally damaging alternative that was available. The fact is NC12 is in bad condition, and it needs replacement and improvement. And the option of doing nothing is not really a viable option in order to maintain access to this portion of the Outer Banks. And if anything, the process that occurred here, the 2008 environmental impact statement and the three subsequent environmental assessments shows that the NEPA process is working as it should. The agencies were looking at different alternatives, investigating them, and then adjusting their decision-making to reflect the environmental analysis that the multiple agencies were conducting. I'd like to briefly address the point about the merger team conflict resolution process potentially leading to an incentive for the agencies to adopt the jug handle bridge alternative. The merger team conflict resolution process doesn't bind the other agencies. There were a total of 13 independent federal and state agencies that had to come together and agree on an alternative. I thought you just told us it didn't make any difference if the environmental analysis is what controls. The environmental analysis is, you're right, Your Honor, you do not need to look at this question. And you can resolve the predetermination claim simply by looking at the sufficiency of the environmental analysis. I had wanted to respond to the plaintiff's concern or argument that the merger team conflict resolution process would result in an incentive to adopt the jug handle bridge alternative, and my point simply is that there is no evidence or basis in the record to conclude that 13 independent federal and state agencies would somehow ignore their statutory obligations and agree on an alternative that was inconsistent with those obligations. But the question ultimately, I think, as she said before explaining that issue, is was the environmental assessment adequate? Did it meet the requirements? Did it raise the appropriate issues? Did it give consideration to the appropriate factors? And your position, I think, is that it did, even if some of it came earlier in the process than you might normally see. It did, and the basis for the 2016 environmental assessment derives from the analysis that was done in 2013 and 14 before settlement negotiations even started. I would like to briefly discuss the plaintiff's argument about the need to supplement the environmental impact statement. To supplement an environmental impact statement, there needs to be a significant change in the project and the scope of environmental impacts that were not previously analyzed in the earlier environmental impact statement. And here plaintiffs have not pointed to any difference that is significant or would result in different significant impacts over what had been studied in 2008. Plaintiffs point to the fact that the alignment is slightly different than what was studied previously, but again don't explain why the difference in the alignment would lead to significant impacts that were not previously considered in the three other environmental documents that were conducted. The plaintiffs also mentioned that the agency should have considered the new information concerning erosion rates and the availability of sand sources, but as this court noted, there were other reasons why the agencies rejected the nourishment alternatives and specifically that nourishing the shoreline would not sufficiently protect NC12 from breaches from both the sound side and the ocean side and the creation of new inlets resulting from storms and coastal action. Also, nourishment could not be used in the wildlife refuge and would result in extreme adverse environmental impacts there, including adverse impacts on endangered species, birds, and sea turtles. And then of course, the area still suffers from high erosion rates. There's hot spots in that area that are of particular concern. I believe I have addressed all the points that I would like to make. I'm happy to answer any other questions should this court have any, but otherwise I would rest on our briefs. Thank you, Ms. Hanson. Thank you. Mr. Justice. Good morning, Your Honors. My name is Colin Justice. I represent NCDOT and Secretary Trogdon. I think that if we look at the sequence of events of this case, it actually shows that the transportation agencies followed exactly what NEPA intends. They did a thorough environmental analysis. They studied a range of alternatives, disclosed impacts. They sought public comment. In 2013, there was a preferred alternative identified, and the NEPA regulations say that an agency is supposed to identify a preferred alternative if it has a preference. After that 2013 EA, as my colleague said, several federal and state agencies expressed concerns and complaints about the preferred alternative. It had not been selected as a lead put at that point. Based on those concerns, before even decision of this prior related case by this court, the agencies had received those comments from EPA, State Division of Environmental Quality, and others, saying we would like you to consider changing your preference to a bridge to the sound. They did that analysis, and that began before the settlement agreement even happened. One of the intents of NEPA is for agencies to respond and change an alternative if public comment and new information shows that there is a better option. The time was right for a decision because there had been all this prior study, the 2008 EIS, there had been a 2010 EA, there had been a 2013 EA, and it was time to make a decision. Based on that input is why the preferred alternative changed. It wasn't solely because of a settlement agreement. It was based on the environmental impacts and the preferences of these other stakeholder agencies. So the least environmentally damaging practical alternative that is an application that is made by the Corps of Engineers in determining permits under the Clean Water Act, that decision was never made for the ineasement bridge. The first time that was ever made by the merger team was after proposing the jug handle bridge in the sound as the LEPPA. And that decision was unanimous among all the members of the merger team. So I think if you look at the sequence of events, it actually supports our position that the agencies followed NEPA, and the change in alternatives was based on public participation in the process, which is exactly what NEPA intends. In fact, in the National Audubon case, this court had said that NEPA intends for an agency to be able to change its mind. And this case is different than other predetermination cases that the plaintiffs decided in their briefs, like Metcalfe, for example, or Moneta v. Davis, where in those instances there was a settlement or a contract that occurred prior to any environmental analysis. That's not the case here. There were multiple rounds of published environmental studies, an EIS, and two EAs before the settlement agreement ever happened. So it was time for a decision to be made. The environmental analysis had already been done. And that's what distinguishes this case from a lot of the predetermination cases at the plaintiff's site. The agency studied a very broad range of alternatives. The plaintiffs talk a lot about beach nourishment, and that was a detailed study alternative initially. It was later removed from consideration, but it wasn't summarily dismissed. It was a detailed study alternative in some of the prior environmental documents. And we've discussed the reasons why it was not suitable. There was also significant public input at every stage of the process. For each EA, the agency sought public comment and responded to it in the subsequent documents. Each time there was a new environmental assessment, the agencies also updated whether there was changed circumstances that would affect the prior decisions. And each time they disclosed those and determined that there weren't significant changes. There were many impacts that were considered, and the recreational and aesthetic impacts that plaintiffs discussed were certainly one of those. In fact, one of the biggest problems with a bridge in the easement was that it would have extremely significant impacts to the entirety of the community of Rodanthe, because it would be putting an elevated bridge that ran right through the middle of all these neighborhoods. So that's one of the reasons that a sound bridge was preferred for the environmental impacts for recreation and aesthetic use. It would be a big disruption of the community. And furthermore, the agencies discussed at length that even in the 2013 EA, if there was a bridge in the easement, based on the expected erosion, that bridge would eventually wind up on the beach and in the surf zone, which would cause significant impacts to wildlife and to recreation on the beach and surf zone. So these very type of impacts that plaintiffs discussed were considered and evaluated thoroughly. Based on the extensive study and the involvement of the public, we asked that this court would uphold the district court's decision and find that the agencies adequately studied the project under NEPA. Thank you. All right. Mr. Schnitzer. Thank you, Your Honors. Two primary points. The first on impacts and the actual harm and the remedies that are now potentially available. This also goes to the question of the insufficiency in the environmental analysis itself. The construction impact process, which I neglected to mention earlier, is significant. And that is ongoing and could potentially be addressed and remediated and mitigated in ways that were not identified due to the rust nature of the process. And that would not necessarily, in fact, mean that the bridge's entire route needs to be changed or that they should go back to the other alternative entirely. Of course, we believe that that is the correct decision. But the NEPA process is certainly supposed to take into account the construction noise and the impact of haul roads, which are not addressed at all in any of the various NEPA studies for the Rodanthe area, for this terminus. For example, the bridge where it comes in now in the slightly adjusted route is literally probably about the length of this courthouse, the construction site, and a large crane set up from the home of one of the plaintiffs with constant construction noise. That is not something that was addressed in the NEPA process. Second thing I would like to note is that... The court, though, as I recall, spent a great deal of time on the construction issue. It was the issue that the court addressed the most exhaustively, I thought, and it concluded that the agencies comparatively evaluated the effects overall. Although the easement bridge could be built more quickly, it would require a larger construction easement and cause more constructive noise. The district court did find, I believe, and correct me if I'm wrong, that there were no clear benefits one way or the other. The issue is that the district court focused on discussions in the 2008 FEIS that were about the terminus of the Bonner Bridge at the north end of the island, and none of those discussions actually addressed the populated area of Rodanthe, a fairly different environment. Moreover, in terms of method of construction, some of it was not even clear at all until well after the Rodanthe. For example, as we mentioned in our reply brief at 22 Note 4, they are using a rather innovative modern track system, which is a different kind of construction. It's still not clear whether or not they're going to use barges or not. They've gone back and forth on that in the record. Is that information that could have been included then? Certainly the basic mechanism by which the bridge is being constructed is something that should have been fully studied in the NEPA process. No, I was just referring to the decisions that you are alluding to that have been made after the record of decision. I'm sorry, I'm not following your question. I'm sorry, I thought you were saying that some of the decisions with respect to construction methodology were still being made. Well, I suppose we don't know precisely when they actually were made, but they certainly were not publicly disclosed or assessed in the NEPA documentation until after the Rod. And were you going to address the wreck? I was, in fact, Your Honor. That is another example of an impact that reflects a hasty revised environmental analysis that, had it been done more thoroughly and more thoughtfully, potentially could have changed the alignment of the bridge and the assessment. The interesting thing is that, to this day, the agencies are still deciding, now that they've determined that it's likely a World War II vessel, whether or not further analysis or modification to the plans of the bridge are appropriate or necessary. This is a site that is a couple hundred yards off of the beach. Its general presence has been known for decades, yet they didn't undertake the necessary analysis to fully determine what it actually was and its significance until after the Rod was actually issued. We submit that that reflects a rush to judgment in the adjustment in the switch of position. It's exactly the direct and substantial pressure reflected, written about in the state of North Carolina case by Judge Niemeyer, not the level of background noise, which is the other end of the spectrum where pressure is acceptable. Is there any substantive harm to that site that you contend exists aside from not being adequately studied? If I may just answer your question, Your Honor. To the shipwreck site, the current planning has the bridge going directly over it and with pylons or moorings very close to and adjacent to it. And there was some question in the earlier documentation about whether or not that was appropriate and they would need to adjust the locations of the anchors or possibly a slight rerouting. They indicated they put a buffer area in from that. That preceded the discovery of it being a World War II vessel, which apparently has raised some heightened sensitivities and questions, and the agencies have said that they are still evaluating the significance of that information. All right. Thank you, Mr. Smith. Thank you, Your Honor. We'll adjourn court for the day, come down and greet counsel.
judges: Paul V. Niemeyer, Allyson K. Duncan, A. Marvin Quattlebaum Jr.